AO 106 (Rev. 04/10) Application for a Search Warrant

```
                                                              FILED
```
## UNITED STATES DISTRICT COURT
for the
Southern District of California

SEP 2 3 2019

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )      Case No.   **19MJ10841**
One ASUS aPhone, )
Phone number: 686-580-1814 )
FP&F number: 2019250700017201 )

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841, 846, 952, 960, and 963 | Importation of a Controlled Substance and Unlawful acts and Attempt and Conspiracy |

The application is based on these facts:

See attached Affidavit of HSI Special Agent Jon Dellinger

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

HSI Special Agent Jon Dellinger
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/23/19

*Judge's signature*

City and state: El Centro, CA      Honorable Judge Michael S. Berg
*Printed name and title*

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

>One ASUS aPhone,
>Phone number: 686-580-1814
>FP&F number: 20192507000017201

The **Target Device** is currently in the possession of the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations and is currently stored at 2051 North Waterman Avenue, El Centro, California, 92243 (Seized Property Vault).

## **ATTACHMENT B**

## ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period May 26, 2019 to July 26, 2019:

a. Drug smugglers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b. Drug smugglers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

c. Drug smugglers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

d. Drug smugglers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e. Drug smugglers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f. Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

**which are evidence of violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963.**

## AFFIDAVIT

I, Jon Dellinger, Task Force Officer with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), having been duly sworn, hereby state as follows:

## INTRODUCTION

1.  This affidavit supports an application for a warrant to search the following electronic device:
>   One ASUS aPhone,
>   Phone number: 686-580-1814
>   FP&F number: 2019250700017201

as described and pictured in Attachment A (incorporated herein by reference), and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 841, 846, 952, 960 and 963. This search supports an investigation of Raul VALLARTA Figueroa ("Defendant" or "VALLARTA") for the crimes mentioned above. A factual explanation supporting probable cause follows.

2.  The **Target Device** was seized from VALLARTA on July 26, 2019, at the time of his arrest at the Calexico East Commercial Port of (POE), as he attempted to smuggle methamphetamine and cocaine into the United States. The **Target Device** is currently in the possession of the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations, Assistant Special Agent in Charge ("ASAC") Calexico, and is currently stored at 2051 North Waterman Avenue, El Centro, California, 92243 (Seized Property Vault).

3.  Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I believe that there is probable cause to believe that a search of the **Target Device** as described in Attachment A will produce evidence of the aforementioned crimes, as described in Attachment B.

4.     The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. Dates, times, and amounts are approximate.

## EXPERIENCE AND TRAINING

5.     I am a peace officer in the State of California and have been since February 2017. I am currently employed as a Detective for the Brawley Police Department as defined by section 830.1 of the Penal Code. 4. I am currently assigned as a Task Force Officer (TFO) with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) Assistant Special Agent in Charge (ASAC), Calexico, California Imperial Valley Border Enforcement Security Task Force (IV-BEST). This group is a multi-agency task force in Imperial, California that focuses on the organized trafficking of narcotics through and along the Southwest Border. My primary duties involve the investigation of narcotics-related violations of Title 21 of the United States Code and the California Health and Safety Code.

6.     As a TFO with IV-BEST, my primary duties include the investigation of narcotics-related violations of Title 21 of the United States Code and the California Health and Safety Code. I have participated in and conducted investigations of violations of various state and federal criminal laws, including distribution of controlled substances, use of a communication facilities to commit narcotics offenses, importation of controlled substances, conspiracy to import, possess and distribute controlled substances, and

money laundering, all in violation of Title 21 and Title 18, United States Code and various California Health and Safety Code and California Penal Code sections. These investigations resulted in arrests of individuals who have imported, smuggled, received and distributed controlled substances, including cocaine, marijuana, heroin, and methamphetamine, and the arrest of individuals who have laundered proceeds emanating from those illegal activities.

7. Through these investigations, my experience and training, as well as discussing the methods and practices of narcotics traffickers with numerous law enforcement officers and confidential sources, I have become familiar with the operations of drug trafficking organizations in the United States and Mexico.

8. I have also spoken with other agents about their experiences and the results of their investigations and interviews. I have become knowledgeable of the methods and modes of narcotics operations, including the methods of operation typically used by narcotics traffickers. I have learned that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances.

9. Conspiracies involved in the smuggling and trafficking of narcotics generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messaging, and phone numbers of co-conspirators. For example, based on my training and experience, I have learned that load drivers smuggling controlled substances across the border are often in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle at which time they receive instructions on how to cross and where and when to deliver the controlled substances.

10. Through my experience and training, as well as discussing the methods and

practices of narcotics traffickers with numerous law enforcement officers and confidential sources, I know that Subscriber Identity Module (SIM) Cards also known as subscriber identity modules are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

11. Based upon my training and experience as a Task Force Officer, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug smugglers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug smugglers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Drug smugglers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d. Drug smugglers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e. Drug smugglers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

    f. Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

12. Based upon my training and experience, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone.

## FACTS SUPPORTING PROBABLE CAUSE

13. On or about July 26, 2019, at approximately 7:35 p.m., defendant Raul VALLARTA Figueroa (VALLARTA) a Mexican citizen applied for admission to enter the United States from Mexico through the Calexico East Commercial Port of Entry, via vehicle lane 2. VALLARTA was the sole occupant and driver of a 2014 white in color, Volvo VNL Semi-truck, bearing California license plate 9F80969 pulling a flatbed trailer, California license plate 4SL2921. During primary inspection, VALLARTA gave a Customs declaration of "Vidrio" (Glass) to Customs and Border Protection Officer (CBPO) L. Duncan. CBPO Duncan referred VALLARTA to secondary inspection based on being unfamiliar with VALLARTA.

14. At secondary inspection, CBPO J. Ciolina was working as an operator for the GANTRY x-ray device and conducted a scan of the vehicle. During CBPO J. Ciolina's examination of the image, CBPO J. Ciolina observed a natural compartment in the front most A-frame of the trailer which was supporting several large piece of industrial glass. As CBPO J. Ciolina adjusted the density of the scan, CBPO J. Ciolina observed small rectangular objects stacked upon each other inside

5

the compartment. CBPO J. Ciolina requested a Canine Enforcement Officer (CEO) to conduct an inspection of the trailer using a Human Narcotics Detection Dog (HNDD).

15. Also at secondary inspection, CEO Barela utilizing his/her HNDD conducted a sniff of the vehicle. The HNDD alerted to the front A-frame and compartment, which was covered with large pieces of glass. Due to the large size of the glass, it had to be removed to access the compartment door. CBPO Perez used a drill to make a hole into the A-frame and probe the rectangular objects located inside the compartment. Once the drill was removed CBPO Perez observed a white crystalline substance on the tip of the probing bit. CBPO Perez conducted presumptive testing of the white crystalline substance. The test of the substance was positive for the presence of methamphetamine.

16. CBPO officers then removed the glass from the trailer exposing the door of the natural compartment. The door was secured by two turn handles and was locked. CBPO Perez drilled the locks and accessed the compartment. The compartment door was opened and five duffel bags were found. The duffel bags were stacked atop each other. Inside the duffel bag, 129 packages of a white crystal substance were located. CBPO Officer utilized the GEMINI to field test the white crystal substance located in the duffle bags. The test yielded positive results for the properties of methamphetamine and cocaine. A total of 82 packages of methamphetamine weighing 67.32 kilograms (148.41 pounds) and 35 packages of cocaine weighing 39.12 kilograms (86.24 pounds) was discovered.

17. At approximately 8:00 p.m., Task Force Officer (TFO) Jon Dellinger and his partner, Special Agent (SA) Luis Salinas responded to the Calexico East POE. The duffle bags containing the packages appeared new and still had brown packaging paper inside the front zippered pockets. There were two blue duffle bags, two red duffle bags, and one black shoulder backpack. Inside each bag was

6

an observable white powder that smelled like baby powder. Each duffle bag had a plastic tag affixed to its zipper. One blue duffle bag had an orange plastic label that read "A25" and "A50"; one blue duffle bag had a blue plastic tag that read "CH"; one red bag had a clear plastic label that read "A50"; and, one red duffel bag had a label that read "A50." The black bag had blue and yellow plastic labels that read "VJ 25" and "CH (2)," respectively. The writing on the labels was consistent with black writing on each of the bundles of narcotics. The narcotics were wrapped in plastic wrap and what appeared to be brown packing tape.

18. At approximately 10:00 p.m., VALLARTA was advised of his *Miranda* rights and witnessed by Special Agent Salina. VALLARTA acknowledged that he understood each right and advised he would not answer any questions without the presence of an attorney. No interview was conducted.

19. I also know that drug trafficking conspiracies require intricate planning and coordination to successfully evade detection. Based upon my professional training and experience, this planning and coordination often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Additionally, co-conspirators are often unaware of a subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of valuable cargo, particularly in the hours following the arrest. Therefore, I believe that the appropriate date range for the search of the **Target Device** is from May 26, 2019, up to and including July 26, 2019.

## METHODOLOGY

20. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices,

can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

21. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

22. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The

personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

22. Based on all of the facts and circumstances described above, there is probable cause to conclude that VALLARTA used the **Target Device** to facilitate violations of Title 21, United States Code, Section(s) 841, 846, 952, 960 and 963.

23. Because the **Target Device** was promptly seized during the investigation of VALLARTA'S trafficking activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by VALLARTA and others continues to exist on the **Target Device**.

24. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Jon Dellinger
Task Force Officer
Homeland Security Investigations

Subscribed and sworn to before me this 23rd day of September, 2019.

Hon. Michael S. Berg
United States Magistrate Judge

9